UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-14026-CR-GRAHAM/MAYNARD

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TONY JAY SAUNDERS,

    Defendant.
_____/

FILED by _____ D.C.
AUG 31 2018
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON FINAL HEARING IN RESPECT TO THE SUPERSEDING PETITION ALLEGING VIOLATIONS OF SUPERVISED RELEASE

THIS CAUSE having come on to be heard for a final hearing in respect to the pending Superseding Petition Alleging Violations of Supervised Release [D.E. 128], and this Court having received testimony, evidence, and arguments of counsel, recommends to the District Court as follows:

1. Defendant is charged by a Petition with the following violations of supervised release:

**Violation Number 1** — **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about February 22, 2018, in St. Lucie County, Florida, the defendant did commit the offense of battery by strangulation, contrary to Florida Statute 784.041(2)(a).

**Violation Number 2** — **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about February 22, 2018, in St. Lucie County, Florida, the defendant did commit the offense of resisting an officer without violence, contrary to Florida Statute 843.02.

**Violation Number 3** — **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about February 22, 2018,

1

|  |  |
|---|---|
|  | in St. Lucie County, Florida, the defendant did commit the offense of burglary of a conveyance or structure with an assault or battery, contrary to Florida Statute 810.02(2)(a). |
| **Violation Number 4** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about February 22, 2018, in St. Lucie County, Florida, the defendant did commit the offense of tampering with a witness, victim or informant, contrary to Florida Statute 914.22. |

2. The Court heard testimony in this case at a detention hearing held on July 2, 2018 and final hearing held on August 15, 2018. The parties agreed this Court could consider testimony from both hearings in determining the matter now before the Court. As a result, the following recitation of facts is taken from both hearings held in this matter.

3. The government called three witnesses: Danielle Peltier, who is the mother of two of Defendant's children, Port St. Lucie Police Department (PSLPD) Officer Salvador Garcia and PSLPD Officer Supreet Fraga. The defense called two witnesses: Sharmane Saunders, who is Defendant's twenty year old daughter, and Colleen Heinssen, who is the mother of Defendant's adult children. The witnesses testified about an incident that occurred on the night of February 22, 2018 at Danielle Peltier's home in Port St. Lucie, Florida. That incident resulted in Defendant's arrest.

4. The government's first witness was Danielle Peltier. She and the Defendant have two children together, ages 2 and 3. She testified that Defendant picked their two children up from her house on February 22, 2018 and kept them for the day. He returned to her house to drop them off around 6:30 pm. While there, he noticed a wet spot on the couch. He commented about it and she told him that their daughter had an accident on the couch. Defendant said that it did not "smell like pee" and left the house. Thereafter, Defendant called her and sent her a series of threatening text messages. He believed the couch was wet not because their daughter had an

accident but because Peltier was sleeping with someone else. After Defendant left, Peltier left the house as well to drop another child off. She "took the long way back" to her house because she was afraid Defendant would be there.[1] When she arrived at her gated community, she drove through the neighborhood to see if Defendant was there. She drove into a cul de sac, and was coming out of the roundabout when Defendant drove his Chevy Silverado truck up to the front of her SUV and blocked her in. Defendant got out of his truck, came around to the driver's side of her SUV, put his hand through the window and grabbed her neck, choking her. He also ripped her shirt. Their two children were in the back seat. Peltier was on the phone with Defendant's sister in law at the time and yelled for her to call the police. Defendant let Peltier go, kicked the front of the SUV, got into his truck and left, driving in reverse all the way back up the street. Peltier was shaken and drove around the cul de sac a few times slowly. She called 911 and stayed on the phone with them until she and the children were inside her home. Shortly after she got off the phone with 911, she heard Defendant at the front door. She tried to keep him out but he had a key and forced his way inside. He yelled at the children to go upstairs and told Peltier, "We need to talk." She told him to get out or she would call the police. He grabbed her phone from her hand and threw it to the floor where it shattered. He pushed her into a wall, then into the nearby garage door, then over to the living room, where she fell over the coffee table. He pushed her onto the couch and began to strangle her. At first he used both hands, but then he took one hand from her throat, closed it into a fist, and attempted to hit her in the face three times. She kicked him and dug her nails into his face. Kicking and screaming, she was able to

---

[1] Ms. Peltier testified that Defendant had been "aggressive" towards her in the past. She claimed that he had "laid hands" on her before and "threatened through a text to have somebody slice her face open." She said she called the police on him for domestic violence four times between 2015 and 2017, but had never pressed charges because she did not want him to go to jail. The government did not proffer any records showing whether in fact the police had previously responded to domestic disputes between the Defendant and Peltier.

wiggle out from under him, falling from the couch to the floor on her stomach. Defendant got on top of her from behind, put all his body weight on her and put a couch pillow over her face. Peltier turned her nose to the left in order to breath and said "Please Tony don't kill me our kids are upstairs!" He flipped her over and got on top of her, then realized who she was and got off of her. She told him "you almost tried to kill me," which he denied. He helped her up, got on his knees and apologized. At that point, the police arrived and Defendant left through a side door.

5. Officer Salvador Garcia was the second witness to testify. He learned from dispatch that a woman had called 911 claiming that the father of her children had choked her, kicked her vehicle and left the housing complex in a Chevy truck. Officer Garcia and his colleague, Officer Druga, responded to the location. When they arrived they saw a Chevy truck parked at the parking lot of the pool area. They stopped to verify that it was empty before making their way to Danielle Peltier's residence. At the residence, they saw a white SUV in the driveway. The SUV had a flag on it that was the same as a flag on the Chevy Silverado truck, so Officer Druga returned to the pool area to investigate the truck further while Officer Garcia knocked on Danielle Peltier's door. At first there was no response but then Peltier came to the door. She told Officer Garcia to "give her a second" to put a shirt on and then came back out. Officer Garcia asked her what happened. She said that nothing happened. She said the father of her children was Tony Saunders, he was on federal probation, and he would go to jail for the rest of his life if she talked. Officer Garcia noticed redness around her neck and asked her twice more if anything had happened. She said no and she just wanted her apartment key back.

6. Officer Garcia left Ms. Peltier's house and drove back towards the pool area where Officer Druga and another officer were talking to the Defendant. When Officer Garcia pulled up, Defendant took off running. The officers chased him, yelling "Stop! Police! Give

up!" Defendant ran a couple hundred yards, approached a six foot steel fence and put his hands on the fence as if to jump over it. Officer Garcia deployed his Taser and Defendant fell. Officer Garcia handcuffed the Defendant and removed the Taser prongs. Defendant was taken to the hospital for medical clearance and then to jail.

7.     Danielle Peltier testified that she went upstairs to check on her children after Officer Garcia left. Her 3 year old said to her "Mommy, did daddy just whip your ass?" She started to cry, and went back downstairs. Shortly thereafter, a female officer knocked on the door and asked if she wanted to give a statement. Danielle Peltier told the female officer what happened, but refused to write anything down because she did not want to be the reason Defendant went to prison "for life." Two weeks later, Defendant's federal probation officer contacted Danielle Peltier and asked for a written statement, which she provided.

8.     During cross examination, defense counsel asked Danielle Peltier how long the events she described took to occur. She was unsure of the times but said "it felt like forever." Pressed further, she estimated that she was in the cul de sac about ten minutes; on the phone with 911 for less than seven minutes; in her house less than seven minutes before Defendant came in; and being attacked by Defendant for fifteen to twenty minutes before the police arrived. She estimated that the police arrived about thirty minutes after she placed the phone call to 911. When asked what she based her estimate on, she said she looked at the clock when the officer came inside to interview her.

9.     Government's Exhibits 1 through 6 are photographs of Danielle Peltier taken by the police officers on February 22, 2018. Exhibit 1 shows redness on Peltier's chest and around her neck. Exhibit 2 shows a scratch on her neck. Exhibit 3 shows scratches on the inside of her arm and on her wrist. Exhibit 4 is an enlarged picture of the scratch on her wrist. Exhibit 5

shows redness on her other arm. Exhibit 6 shows a mark on her arm above her elbow. The government also offered Government's Exhibit 7 into evidence, which is the written statement Danielle Peltier provided to Defendant's federal probation officer.[2]

10. Officer Fraga was the government's next witness. She testified that on February 22, 2018 she responded to a report of domestic violence involving the Defendant. When she arrived, she saw Officer Druga talking to the Defendant by the pool area of the housing complex. She exited her vehicle and walked up to Officer Druga and the Defendant. Officer Garcia's patrol car pulled into the parking lot and Defendant took off running. Officers Garcia and Druga pursued him, while Officer Fraga went to Danielle Peltier's residence. Ms. Peltier was "very upset and visibly shaken" when Officer Fraga arrived. Ms. Peltier was hesitant to fill out the domestic violence forms and expressed concern about backlash she could receive from Defendant's family. Ms. Peltier told Officer Fraga that Defendant wrapped his hands around her throat and choked her because he assumed she was having sex with another man on the sofa. Ms. Peltier claimed Defendant had never been violent with her before.

11. The government rested its case.

---

[2] Although Exhibit 7 was admitted, the undersigned did not consider it in reaching the conclusions in this Report and Recommendation. The government characterized Exhibit 7 as a prior consistent statement that corroborated Peltier's testimony. It was unclear at that point in the hearing whether it was being offered for a more specific purpose since defense counsel's theory of the case appeared to be that Ms. Peltier's story was fabricated and could not be believed. Having heard all of the testimony now, however, the undersigned sees Exhibit 7 is offered to corroborate Ms. Peltier's testimony generally, not to rebut a charge of recent fabrication where the motive to fabricate arose after the prior consistent statement was made. Under Federal Rule of Evidence 801(d)(1), "[P]rior consistent statements are treated as admissible non-hearsay only if they are offered to rebut a specific allegation of recent fabrication, not to rehabilitate credibility that has been generally called into question." *United States v. Drury*, 396 F.3d 1301, 1316 (11th Cir. 2005) (emphasis added). Also, a prior consistent statement is admissible only if it was "made before the alleged influence, or motive to fabricate, arose." *Tome v. United States*, 513 U.S. 150, 158, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). Although the Rules of Evidence do not apply to violations of supervised release hearings, *U.S. v. McKenzie*, 505 Fed. Appx. 843 (11th Cir. 2013), Defendant's objection is well-taken. This Court sees no reason to depart from the general rule that such a statement should not be considered outside of the purposes set out in FRE 801(d)(1).

12. The first defense witness was Sharmane Saunders. Ms. Saunders is Defendant's twenty year old daughter. She testified that she saw her siblings (Danielle Peltier's two children) several times a week before the detention hearing on July 2, 2018. Since that hearing, Danielle Peltier has not let Sharmane Saunders see the children. Sharmane Saunders believes this is because she attended the detention hearing in support of her father and wrote a letter to the Court on his behalf. Sharmane testified that prior to the hearing Danielle Peltier told her not to come to the hearing, and if she did she would not see her siblings again. Defense counsel offered Defense Exhibit 4, which is a compilation of texts between Danielle Peltier and Sharmane Saunders before and after the July 2, 2018 detention hearing.

13. On cross examination, Sharmane Saunders acknowledged that she herself has made false accusations against the Defendant in the past. She claimed Defendant had injured her when she had actually gotten into a fight at a football game. She now denies that Defendant has ever hit her.

14. Sharmane's mother, Colleen Heinssen, also testified for the defense. She has known the Defendant for over twenty-six years and they have two children (ages 20 and 19) together. Colleen Heinssen and the Defendant live together along with their two adult children. She met Danielle Peltier within the last year because Defendant watches the children for Peltier while Peltier is at work. Heinssen and Peltier have come to know each other during that time and have talked about the February 22nd incident on several occasions. According to Heinssen, Peltier told her that she called the police on Defendant on February 22nd because she was mad at him for not paying her bills since she moved into a more expensive apartment. Peltier also was mad because Defendant was seeing other women. Peltier told Heinssen that she hit the Defendant and then tore her own shirt to make it look like he had torn it. Heinssen said Peltier is

writing a book about her life with the Defendant and Peltier's idea for her "best seller ending" is for Defendant to kill himself in jail. Heinssen also claimed Peltier offered her $1500 from Peltier's tax refund to attend court with Peltier and say Defendant had committed domestic violence against Heinssen as well. On cross examination, Heinssen said that although she and Defendant have known each other for twenty six years, live in the same house, and have children together, they are "just friends" and "roommates." Defendant pays bills at the residence he shares with her. Heinssen denied convincing her daughter Sharmane Saunders to drop charges against the Defendant in the past. She also denied talking to Defendant about her testimony.

15. During the government's case in chief, defense counsel questioned Danielle Peltier about her relationships with Sharmane Saunders and Colleen Heinssen. Regarding Sharmane Saunders, Peltier admitted that Sharmane had not seen the children since the detention hearing on July 2nd but said that was because Sharmane did not want to deal with the "bull crap" and Peltier did not want any part of that side of the family anymore. Peltier testified, "I wasn't upset that she wrote a letter [for court for her father] ... that is her father. I was upset she told me she didn't know about the court date when she did." As for Colleen Heinssen, Peltier said she and Heinssen had spoken frequently about what happened that night but she never told Heinssen she fabricated the story against the Defendant. She denied offering Heinssen money to testify at the proceeding and said she never offered $1500 to Heinssen to falsely accuse the Defendant.

16. Defense counsel offered several exhibits into evidence. Defendant's Exhibit 1 is a Google Earth map of Ms. Peltier's residence and housing complex. Defendant's Exhibit 2 is a photograph of Danielle Peltier on the night of the incident showing the length of her fingernails. Defendant's Exhibit 3 is the law enforcement CAD Report. Defendant's Exhibit 4 is a

compilation of text messages between Sharmane Saunders and Danielle Peltier before and after the July 2nd detention hearing. Defendant's Exhibit 5 is a photograph of Defendant on February 22, 2018 after the incident took place. It was offered to show there are no marks or scratches on Defendant's face despite Peltier's claim that she dug her nails into Defendant's face to get away from him during the attack.

17. The Defendant rested his case.

## ANALYSIS

18. This Court has considered all of the evidence submitted, including the sworn testimony and exhibits, as well as arguments of counsel. Revocation of supervised release is treated as part of the penalty phase for the initial offense involved. To constitute a violation, the conduct involved need not be criminal and the defendant need only be found culpable by a judge under a preponderance of the evidence standard. *United States v. Cunningham*, 607 F.3d 1264 (11th Cir. 2010).

**Violation 1: Battery by Strangulation**

19. To establish Violation Number 1, the government must prove Defendant committed the offense of battery by strangulation by a preponderance of the evidence. Battery by strangulation occurs when a person knowingly and intentionally (1) impedes the normal breathing of a victim against her will by applying pressure on the throat or neck or by blocking the nose or mouth; (2) in so doing creates a risk of great bodily harm; and (3) the person is a family member of the victim. Individuals who have children together are "family members" for these purposes. § 784.031(2)(a), Fla. Stat.; Florida Pattern Jury Instruction No. 8.5(a), Domestic Battery by Strangulation (2008).

20. The government has met its burden as to Violation 1. Danielle Peltier's testimony established to this Court's satisfaction that Defendant committed domestic violence by strangulation on February 22, 2018. Peltier gave a detailed, chronological and coherent account of what happened. Her demeanor on the stand was emotional yet direct. She identified specific reasons for the altercation, specified where events occurred (from the cul de sac to throughout her house), and had no difficulty recollecting the events, answering questions or providing relevant details. She identified at least one other person who heard some of the altercation on the phone (Defendant's sister in law), although the government did not call that person as a witness in the case. On the night of February 22, 2018, she relayed the same details to the 911 dispatcher that she testified to in this case. Both Officers Garcia and Fraga testified to her distraught demeanor when they encountered her and the photographs of her in Government's Exhibits 1 through 6 show injuries consistent with the altercation she describes.

21. This Court is further persuaded by the Computer Aided Dispatch (CAD) Report offered as Defendant's Exhibit 3. A CAD Report lists all of the information transmitted back and forth between dispatch and police officers while handling a 911 call. Despite defense counsel's efforts to use the CAD Report to cast doubt on Ms. Peltier's testimony, that document actually supports rather than discredits her version of events. The first page of the CAD report indicates that the 911 call came in at 9:05 pm and was terminated at 9:07 pm. A police unit was dispatched at 9:08 pm and a police car arrived at 9:11 pm. Defense counsel used this "arrival" time to argue that only six minutes passed between Ms. Peltier's call to 911 and the arrival of the police at her doorstep. He implied that all of the events Ms. Peltier described could not have happened within such a short time frame. For her part, Peltier estimated that Defendant's attack in the residence took about fifteen minutes, although it "felt like forever." The CAD Report

corroborates that. She called 911 at 9:05 pm and the police did not show up at her door until 9:20 pm because they first looked for the white Chevy Silverado truck which they found at the pool area at 9:19 pm. [Def. Ex. 3 at 6]. This is consistent with Officer Garcia's recollection that they saw a white Chevy truck at the pool area when they arrived and verified that it was empty before proceeding to Peltier's residence. Thus, while a police unit may have "arrived" at the complex at 9:11, according to the CAD Report it did not "arrive" at Ms. Peltier's residence until 9:20. *Id.* Ms. Peltier also estimated that about thirty minutes passed between the times she called the police and when police arrived. When asked what she based this estimate on, she said she looked at her clock when one of the officers came into her home after she went outside and went upstairs to check on the children. [DE 144 at 37]. From the officers' testimony and the CAD Report, it appears that she spoke to Officer Garcia outside at about 9:20 and spoke to Officer Fraga inside her home at about 9:30.[3] Therefore, her conversation with Officer Fraga did in fact take place a half hour or so after she called 911. At any rate, nothing about the incident occurred within six minutes as defense counsel proposed. This Court finds the CAD Report's contemporaneous notes from that night to support Peltier's testimony.

22.     This Court is not persuaded by the testimony of Colleen Heissen. She was not present during the incident on February 22nd and she has her own motive to keep Defendant out of prison since she lives with him and their children as a family and benefits from his financial support. More importantly, her story simply does not make sense. She claims Peltier called the police and falsely accused the Defendant on February 22nd because he was not paying Peltier's

---

[3] Officer Garcia testified that Peltier came out to speak to him after she put on a shirt. That occurred at 9:20 based on the CAD Report. Officer Fraga testified that she went to the residence to talk to Peltier while the other officers pursued the Defendant. According to the CAD Report, Defendant fled at 9:28 pm (the code entered is 1031 which means "in pursuit") and was tased at 9:32 pm,. Thus, the Court infers that Officer Fraga was inside Peltier's home at or around 9:30 [Def. Ex. 3 at 6].

bills and was seeing other women. Yet, when Officer Garcia arrived at Peltier's home and asked her what happened, she refused to talk. She told Garcia that Defendant was on federal probation, she did not want him to go to jail and she did not want to be the reason he went to prison "for life." Even when she acknowledged to the female officer what happened, she was still reluctant and refused to write anything down. This behavior is not consistent with one who makes a false 911 call, rips her own shirt, causes her own injuries, and reddens her own neck and chest in an effort to frame the Defendant. If she wanted to send Defendant to jail to craft a "best seller ending" for a book, she would not have refused to tell Officer Garcia what happened or denied past relationship abuse. She would have answered questions immediately, provided a written statement, and told them she wanted to press charges. For Heinssen's story to be true, Peltier would have had to call 911 to report a false story about what happened in the cul de sac, shatter her own phone, tear her own shirt, injure and scratch herself, only to refuse to tell the responding officer the story she had gone to such effort to contrive. That is nonsensical. The undersigned also does not believe Peltier offered Heinssen $1500 to falsely testify against Defendant. If Peltier needed money so badly that she would levy false charges against the Defendant, why would she offer such a significant sum of money to Colleen Heinssen instead of using it to pay her own bills? That defies common sense and the undersigned rejects Heinssen's testimony.

23. Nor is the Court persuaded by Sharmane Saunders testimony. Whether or not Peltier stopped Sharmane from seeing the children after July 2nd has no bearing on the undersigned's determination of what happened on February 22, 2018.[4] In addition, Sharmane

---

[4] Despite defense counsel's arguments to the contrary, this Court finds the text messages in Defendant's Exhibit 4 actually to support Peltier's version of her dispute with Sharmane. Peltier never says in the texts that she is withholding the children because Sharmane came to court and supported her father. Rather, she tells Sharmane she is upset for the same reason stated to the Court – she feels she was honest with Sharmane but Sharmane was not honest with her. On July 7, Peltier sent the following text to Sharmane Saunders:

admitted on the stand (rather nonchalantly the Court observes) that she herself has a history of lying since apparently she put false accusations on her dad in the past. Sharmane Saunders is not a credible witness and her testimony is not germane to the issues to be resolved by this Court.

24. The undersigned finds Ms. Peltier to be a credible witness. She impressed the Court as one who was telling the truth. Her testimony established that Defendant wrapped his hands around her throat twice – once in her SUV and once in her home – and put a pillow over her nose to impede her breathing, which meets the criteria of the offense alleged in Violation 1. Her testimony was consistent in all material respects with the statements she gave to the 911 dispatcher[5] and to Officer Fraga that night. It was also consistent with the CAD Report. The government has met its burden with respect to Violation 1.

**Violation 2: Resisting an Officer without Violence**

25. Florida Statute § 843.02 provides, in pertinent part, that "[w]hoever shall resist, obstruct, or oppose any officer ... in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree."

---

> I don't understand why you are in such a tiff with me. When all I said to you that day was why didn't you tell me you wrote a statement for your dad. That was it. ... I know he's your dad and you'll always have his back that wasn't the case. The fact was you not telling me or when I was honest you were not to me.

Then, in a series of undated texts, Peltier say to Sharmane Saunders:

> The fact that you say it has nothing to do with you when you were involved the whole time. The judge and his public defender said whom wrote a statement. I asked if you knew of the court date you said no. ... all it was was a text to saw I knew whom wrote statements. And I thought you were honest with me from jump like I was to you. The fact being is I didn't want you there because I knew this would happen. I don't want you in this drama with him and I. Its not anyone's dealings but mine and his. Like I said before, if you were [my daughter] I wouldn't have wanted you to go.

*Id.*

[5] According to Defense Exhibit 3, Ms. Peltier told the 911 dispatcher that her children's father, Tommy Sanders, "is leaving in a whi chev Silverado ... towards the front gate. Male put his hands around [her] neck ... and kicked her truck." *See* Defendant's Exhibit 3 at 6.

To support a conviction for obstruction without violence, the State must prove: (1) the officer was engaged in the lawful execution of a legal duty; and (2) the defendant's action, by his words, conduct or combination thereof, constituted obstruction or resistance of that lawful duty. *C.E.L. v. State*, 24 So.3d 1181, 1185-86 (Fla. 2009).

26. Defendant argues that the officers were not engaged in the lawful execution of a legal duty because Officer Garcia did not have probable cause to arrest the Defendant when Defendant fled from the police. In support, defense counsel points to Officer Garcia's testimony on the stand that he did not believe he had probable cause to arrest the Defendant when he pulled up to the pool area parking lot. As a general rule, flight, standing alone, is insufficient to form the basis of a resisting without violence charge. *See Mosley v. State*, 739 So.2d 672, 675 (Fla. 4th DCA 1999). "To be guilty of unlawfully resisting an officer, an individual who flees must know of the officer's intent to detain him, and the officer must be justified in making the stop at the point when the command to stop is issued." *Id.* at 1186; *see also H.H. v. State*, 775 So.2d 397, 398 (Fla. 4th DCA 2000). "A stop is justified when an officer observes facts giving rise to a reasonable and well-founded suspicion that criminal activity has occurred or is about to occur." *Id.*; *see also Davis v. State*, 973 So.2d 1277, 1279 (Fla. 2d DCA 2008). Thus, the standard is reasonable suspicion, not probable cause. Whether an officer's suspicion is reasonable and well-founded depends on the totality of the circumstances existing at the time of the investigatory stop. *Id.*; *see also Travers v. State*, 739 So.2d 1262, 1263 (Fla. 2d DCA 1986). Where officers have reasonable suspicion to detain a person, they may lawfully order that person to stop. Failing to do so violates § 843.02. *Id.*

27. Here, officers certainly had reasonable suspicion to detain the Defendant when he decided to flee. They knew someone had called 911 saying she was choked. They knew the

suspect's name was "Tommy Sanders" and he was on federal supervised release. They knew the suspect was driving a white Chevy Silverado truck near the location of Peltier's housing complex. They had identified a vehicle matching that description at the pool area of the complex. They knew it was related to the situation since it bore the same flag on it as the SUV at Peltier's residence. According to the CAD Report, they were speaking to the Defendant near the truck and had identified him as "Tony Sanders". [Def. Ex. 3 at 6]. Officer Garcia had been to the residence and observed red marks around Danielle Peltier's neck. Based on the totality of the circumstances there was *at least* reasonable suspicion to detain the Defendant, if not probable cause. Defendant knew they were officers because they were in marked vehicles and patrol cars. He fled in knowing defiance of the officers' lawful orders to stop. This meets the government's burden as to Violation 2.

**Violation 3: Burglary of a Structure or Conveyance**

28. Florida Statute § 810.02 provides in pertinent part:

> 810.02 Burglary.—
> (1) "Burglary" means entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.

Fla. Stat. 810.02. To support Violation 3, the government must show by a preponderance of evidence that (1) Defendant entered Peltier's house; (2) he intended to commit an offense inside her house; and (3) he was not licensed or invited to enter. Florida Pattern Jury Instruction No. 13.1, Burglary (2008). Peltier testified that she tried to keep Defendant from entering the house, but he forced his way inside with his key. She told him to leave or she would call the police. Almost immediately upon entering the home, he smashed her phone and attacked her. Although Defendant had a key to the residence, Peltier's effort to keep him out when he came to the door,

and her demand that he leave or she would call the police demonstrates that he did not have her permission to enter the house. This evidence meets the government's burden on Violation 3.

**Violation 4: Tampering with a Victim**

29. Florida Statute Section 914.22 provides, in pertinent part, that a person commits the crime of tampering with a witness, victim or informant when that person: "knowingly uses intimidation or physical force, or threatens another person, or attempts to do so ... with intent to cause or induce any person to: ... (e) Hinder, delay, or prevent the communication to a law enforcement officer or judge of information relating to the commission or possible commission of an offense." To prove a violation of § 914.22, the government must show that through some knowing act, threat, or attempted act, Defendant "specifically intended to hinder, delay, or prevent the communication of information regarding a crime to a law enforcement officer." *Gill v. State*, 622 So.2d 92, 93 (Fla. 2d DCA 1993).

30. Danielle Peltier testified that when Defendant forced his way into her home she told him to leave or she would call the police. He grabbed her cell phone out of her hand and threw it onto the floor where it broke. Although the government did not introduce the broken phone or pictures of it into evidence, Officer Garcia observed the broken phone and collected it as evidence when he returned to the residence that night. On cross examination, defense counsel suggested that Peltier's statement that she would call the police could not be believed because she had already called 911 before the Defendant arrived. That argument is unconvincing, however. Peltier called 911 about what happened in the cul de sac. That was before Defendant forced himself into her residence and attacked her again. Indeed, it was fortunate that she called 911 before he got there or she would not have been able to do so because he damaged her phone. This Court is satisfied based on the testimony that Defendant broke Peltier's phone with specific

intent to prevent her from calling the police. Thus, the government has met its burden as to Violation 4.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant be found to have violated his supervised release in respect to Violation Numbers 1, 2, 3 and 4. The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald L. Graham, the United States District Judge assigned to this case. Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida this __31st__ day of August, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE